**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

WHOLE ENCHILADA, INC.,       )
       Plaintiff,           )
                         )
       v.                 )       Civil Action No. 07-1533
                         )
TRAVELERS PROPERTY CASUALTY    )       Judge Nora Barry Fischer
COMPANY OF AMERICA,       )
       Defendant.       )
                         )
                         )

## MEMORANDUM OPINION

This matter is before the Court on cross motions for summary judgment filed by the plaintiff and the defendant. Based on the foregoing, the defendant's motion [24] is GRANTED and the plaintiff's motion [8] is DENIED.

## PROCEDURAL HISTORY

On November 9, 2007, the plaintiff, Whole Enchilada ("Whole Enchilada") filed a complaint in declaratory judgment against the defendant, Travelers Property Casualty Co. of America ("Travelers"), and for breach of contract based on Travelers' alleged duty to defend and indemnify Whole Enchilada in a class action suit brought against it for alleged violations of the Fair and Accurate Credit Transactions Act ("FACTA"). The Complaint seeks a declaration from this Court that Travelers has a duty to defend and indemnify under one or both of two insurance policies issued by Travelers to Whole Enchilada and damages for breach of contract. (Docket No. 1).

Whole Enchilada filed a Motion for Partial Summary Judgment and Memorandum of Law in Support as to Travelers' duty to defend on February 27, 2008. (Docket No. 8). On March 28, 2008, Travelers filed a Motion for Summary Judgment as to Travelers' duty to defend and indemnify the underlying litigation.[1] Whole Enchilada filed a Reply Brief in Support of its Motion for Summary Judgment and in Opposition to Travelers' Cross Motion for Summary Judgment on April 28, 2008. (Docket No 32). Travelers likewise filed a Reply Brief in support of its Motion for Summary Judgment on May 13, 2008. (Docket No. 36). The Court notes that both parties chose to file motions for summary judgment prior to completing discovery. As the parties have now fully briefed the matter, the Court turns to the disposition of both motions for summary judgment.

## FACTUAL BACKGROUND

At issue in this case is the defense and indemnification of the "*Reed* litigation." On March 19, 2007, Thomas A. Reed Jr. ("Reed"), on behalf of himself and all others similarly situated, filed a class action complaint against Whole Enchilada for alleged violations of FACTA at *Reed, et al v. Whole Enchilada, Inc.*, Civil Action No. 07-cv-357.

---

[1]     The Court notes that Whole Enchilada's complaint seeks a declaratory judgment as to both Travelers' duty to defend and duty to indemnify. (Docket No. 1). However, in its Motion for Partial Summary Judgment, Whole Enchilada seeks judgment only as to Travelers' duty to defend. (It should be further noted that said motion was filed prior to this Court's final approval of a class action settlement in a related action at Civil Action 07-cv-0357 on March 21, 2008.) In its Memorandum of Law in Support of Motion for Partial Summary Judgment Whole Enchilada states: "[u]pon approval of the settlement in the Reed litigation, Whole Enchilada also will seek summary judgment against Travelers for indemnification of amounts paid in connection with that settlement." (Docket No. 9, at 2, n. 2). However, no such motion has been filed.

(Docket No. 12, Exh. A).  A Second Amended Class Action Complaint ("Complaint") was filed on August 3, 2007.  (Docket No. 12, Exh. B).

**1.	The Fair and Accurate Credit Transactions Act ("FACTA")**

The Fair and Accurate Credit Transactions Act, 15 U.S.C. §1681, was enacted on December 4, 2003 as an amendment to the Fair Credit Reporting Act, 15 U.S.C. § 1681. FACTA provides, in relevant part, for the truncation of credit and debit card numbers on customers' receipts as follows:

> (1)	In general.  Except as otherwise provided in this subsection, no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number of the expiration date upon any receipt provided to the cardholder at the point of sale or transaction.

> (2) Limitation.  This subsection shall apply only to receipts that are electronically printed, and shall not apply to transactions in which the sole means of recording a credit card or debit card account number is by handwriting or by an imprint or copy of the card.

> (3) Effective date
> This subsection shall become effective--

>> (A) 3 years after December 4, 2003, with respect to any cash register or other machine or device that electronically prints receipts for credit card or debit card transactions that is in use before January 1, 2005; and

>> (B) 1 year after December 4, 2003, with respect to any cash register or other machine or device that electronically prints receipts for credit card or debit card transactions that is first put into use on or after January 1, 2005.

15 U.S.C.A. § 1681c.  The statute further attaches liability for willful non-compliance of the statute:

Any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of--

> (1)(A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000; or …

15 U.S.C.A. § 1681n.[2]  In signing the statute into law, President Bush commented:

> … [T]his law will help prevent identity theft before it occurs, by requiring merchants to delete all but the last five digits of a credit card number on store receipts. Many restaurants and merchants have already adopted this practice. All will now do so.

"Remarks on the Signing of the Fair and Accurate Credit Transactions Act of 2003," http://www.presidency.ucsb.edu/ws/index.php?pid=62888. The purpose of the FACTA amendments is to protect consumers from the potential of identity theft. *Id.* ("This bill … confronts the problem of identity theft. A growing number of Americans are victimized by criminals who assume their identities and cause havoc in their financial affairs. With this legislation … the Federal Government is protecting our citizens … against identity theft."); (Docket No. 10 at ¶ 14; Docket No. 23 at ¶ 14).

### 2. The Reed Litigation

---

[2]      On June 3, 2008 15 U.S.C. § 1681n was amended to limit the definition of "willful noncompliance" to remove from coverage of the statute the printing of an expiration date on a receipt by the "Credit and Debit Card Receipt Clarification Act of 2007", 15 U.S.C. § 1681n, as amended.  *See* Pub.L. 110-241, § 3(a). As such, compliance with the provision requiring the truncation of the last five digits of the credit/debit card number will constitute willful noncompliance under the statute, but printing an expiration date only will not. The amendment applies retroactively from the effective date of FACTA, December 4, 2004. *Id.*

The *Reed* Complaint specifically alleges that on March 14, 2007, after the effective date of the FACTA statute, Whole Enchilada provided Reed with an electronically printed receipt which included the expiration date of Reed's credit or debit card at its McKnight Road location in Pittsburgh. (Docket No. 12, Exh. B at ¶ 67). The Complaint contains the following allegations:

> 35. Truncation standards, including the standards reflected in the Visa Merchant Rules and in FACTA, permit the publication of the last four or five digits of customer account numbers on the receipt presented to customers at the point of sale. The publication of this minimal amount of account information is necessary to facilitate merchant account reconciliation, processing of returns, etc. In isolation, the publication of only the last four or five digits of a customer account number significantly limits the extent to which a potential identity thief can effectively use customer receipts disseminated at the point of sale to facilitate identity theft.

> 36. However, the publication of expiration dates on customer receipts disseminated at the point of sale, in addition to the last four or five digits of the customer account number, exponentially increases the possibility of identity theft, which is the obvious reason that Visa, and then Congress, requires the truncation of expiration dates.

(Docket No. 12, Exh. B. at ¶¶ 35, 36). The Complaint further specifically alleges that Whole Enchilada:

> 68. … at the point of sale or transaction with members of the class, provided either: a) through the use of a machine that was first put into use on or after January 1, 2005, at any time after such date; or b) through any machine at any time after December 4, 2006, each member of the class with one or more electronically printed receipts on each of which [Whole Enchilada] printed, for each respective class members, more than the last five digits of such member's credit card or debit card number and/ or printed the expiration date of such member's credit or debit card.

> …

> 71. … despite knowing and being repeatedly informed about FACTA and the importance of truncating credit card and debit card numbers and preventing the printing of expiration dates on receipts …

74      … willfully violated FACTA in conscious disregard of the rights of [Reed] and the members of the class to an increased risk of identity theft and credit and/ o r debit card fraud.

(Docket No. 12 Exh. B at ¶¶ 68, 71-74). The Complaint sought, *inter alia*, statutory damages of, "not less than $100 and not more than $1000" for each violation, pursuant to the provisions of FACTA. *Id*. at ¶ 75.

A hearing was held before this Court regarding the proposed class action settlement agreement filed in the *Reed* litigation at C.A. No. 07-cv-357 on March 20, 2008. (*See* C.A. No. 07-cv- 357, Docket No. 53). On March 21, 2008, this Court granted final approval of the class action settlement agreement filed on December 27, 2007 and a judgment was entered thereon. (*See* C.A. No. 07-cv-357, Docket No. 40 Exh. 2; Docket Nos. 49-50; *See also* Docket No. 12, Exh. 1).

3.      **Commercial General Liability Policies**

In July 2005, Travelers issued Big Burrito Holding Company a commercial general liability insurance policy, bearing Policy No. Y-630-7883B69A-TIL-05. (Docket No. 12, Exh. C). The 2005 policy was effective for the policy period of July 1, 2005 to July 1, 2006. *Id*. Big Burrito Holding Company is the parent corporation for Whole Enchilada. (Docket No. 25 at ¶ 10; Docket No. 10 at ¶ 1).

Likewise, in July 2006, Travelers issued a commercial general liability insurance policy, bearing Policy No. 630-7883B69A-TIL-06. (Docket No. 12, Exh. D). The 2006 policy was effective for the policy period of July 1, 2006 to July 1, 2007. *Id*. Whole Enchilada is a named insured under both the 2005 and 2006 policies. (Docket No. 12,

Exhs. C, D). Both policies were issued using a standard Commercial Liability Coverage Form, number CG 00 01 10 01, which was drafted by Insurance Services Organization ("ISO").[3] (Docket No. 23 at ¶ 5; Docket No. 12, Exhs. C, D). Both the 2005 and 2006 policies include a WEB XTEND endorsement numbered CG DZ 34 11 03 and CG DZ 01 05, respectively. *Id.*[4] There is a dispute between the parties as to the potentially applicable policy provisions. (Docket No. 10 at ¶ 6; Docket No. 23 at ¶ 6). Specifically, there is an issue as to whether the Coverage "B" provisions of the standard insuring agreement are applicable or whether the WEB XTEND endorsement attached to the policies controls. (Docket No. 10 at ¶ 11; Docket No. 23 at ¶ 11).[5]

The ISO form ("standard insuring agreement") provides, in relevant part, as follows:

**COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**

    **1.**    **Insuring Agreement**

        **a.**    We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury"

---

[3]    ISO is a corporation that provides insurance products and services to property and casualty insurers and reinsurers. *See* ISO's website, at http://www.iso.com/index. The organization provides, among many other services, underwriting information and services, information regarding policy language and rules and information regarding commercial general liability policies. *Id.*

[4]    The Coverage B provisions and the WEB XTEND provisions in the 2005 and 2006 policies are identical. (Docket No. 12, Exhs. C,D; Docket No. 9 at 4, n. 4). Therefore, the 2005 and 2006 policies, unless otherwise specified, will hereinafter be referred to collectively as "policy."

[5]    The Court will discuss the applicability of the WEB XTEND endorsement in its foregoing analysis.

to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the Insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply …

## Section V- DEFINITIONS

**14**.    "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses: …

… **e.** Oral or written publication, in any manner, or material that violates a person's right of privacy; …

(Docket No. 12, Exh C. at 22; Exh. D at 22).    Furthermore, the WEB XTEND

Endorsement further provides:

## WEB XTEND LIABILITY

## COVERAGE B. PERSONAL INJURY, AD-

## VERTISING LIABILITY (SECTION I- COVERAGES) is
Deleted in its entirety and replaced by the following:

## COVERAGE B. PERSONAL INJURY, AD-
## VERTISING INJURY AND WEB SITE INJURY LIABILITY

**1.**    **Insuring Agreement.**

a.    We will pay for those sums that the insured becomes legally obligated to pay as damages because of "personal injury", "advertising injury" or "web site injury" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "personal injury". "advertising injury" or "web site injury" to which this insurance does not apply. …

8

(Docket No. 12, Exh. V at 25-27; Exh. D at 25-28). The endorsement defines "advertising injury" and "personal injury" as follows:

## SECTION V- DEFINITIONS

**ADVERTISEMENT**
The definition of **"Advertisement"** (Section V- DEFINITIONS) is deleted in its entirety.

**ADVERTISING INJURY**
The definition of **"Advertising Injury"** (Section V- DEFINITIONS) is deleted in its Entirety and replaced by the following:

    **1.**    "Advertising injury" means injury, arising out of one or more of the following offenses: …

…     **b.**    Oral, written or electronic publication of material that appropriates a person's likeness, unreasonably places a person in a false light or gives unreasonable publicity to a person's private life; or …

## PERSONAL INJURY

The definition of **"Personal Injury"** (Section V-DEFINITIONS) is deleted in its entirety and replaced by the following:

"Personal injury" means injury, other than "bodily injury" arising out of one ore more of the following offenses: …

    e.    Oral, written or electronic publication of material that appropriates a person's likeness, unreasonably places a person in a false light or gives unreasonable publicity to a person's private life.

(Docket No. 12, Exh. C at 25-27; Exh. D at 25- 28).

**4.**    **The Instant Litigation**

On March 28, 2007, Whole Enchilada provided notice of a claim for coverage from Travelers for the *Reed* litigation under the 2006 policy. (Docket No. 12, Exh. E).

Thereafter, on May 3, 2007, Andrew Makar ("Makar"), the Director of Liability MCU for Travelers sent a reservation of rights letter[6] to the Chief Financial Officer of Whole Enchilada, John Docherty ("Docherty"), Whole Enchilada's counsel and its broker, denying coverage for the *Reed* litigation under either or both the 2005 and 2006 policies. (Docket No. 12, Exh. F). Specifically, the letter denied coverage because the allegations in the Complaint did not fall within the language of Coverage "A" or Coverage "B" of the standard insuring agreement, stating that:

> [a]ll of the allegations arise out of the alleged violation of the FACTA act. These allegations/ damages do not meet the definition of an occurrence, bodily injury, personal and advertising injury or property damage as defined by the policy; therefore none of the allegations contained in the complaint fall within the scope of coverage "A" or "B" insuring agreement.

(Docket No. 12, Exh. F). Furthermore, the letter contained the following provision:

> [t]he failure of Travelers to point out any further terms, conditions or exclusions of its policy shall not waive any current or future rights of defense of Travelers pursuant to the Travelers, or an act to prevent Travelers from asserting such rights or defenses.

(Docket No. 12, Exh. F at 3).

---

[6] "A reservation of rights is unilateral, written notice from the insurer to the policyholder that the insurer may disclaim coverage for one or more claims in issue based on terms of the insurance policy, legal principles precluding coverage, violation of policy provisions by the insured, or some combination of these factors." NORTON ON INSURANCE COVERAGE IN PENNSYLVANIA 2D ED.§ 1.C(1). In Pennsylvania, an insurer has not prejudiced its defense by denying coverage under an inapplicable policy provision. *Id.* (citing *Nationwide Mut. Ins. Co. v. Nixon*, 682 A.2d 1310 (Pa. Super. 1996), *app. denied*, 693 A.2d 589 (1997)). Furthermore, in a reservation of rights letter, the insurer reserves its right to deny coverage on other grounds. *Id.*; *Beckwith Machinery Co. v. Travelers Indemnity Co.,* 638 F.Supp. 1179 (M.D. Pa. 1986).

Makar also sent an undated letter[7] addressed to Big Burrito, which clarified Travelers' position with respect to coverage. Specifically, the letter stated that under the Coverage "A" and the WEB XTEND endorsement, there would be no coverage for the *Reed* litigation. (Docket No. 12, Exh. G). The letter again provides:

> [a]ll of the allegations arise out of the alleged violation of the FACTA act. These allegations/ damages do not meet the definition of an occurrence, bodily injury, personal injury advertising injury or property damage as defined by the policy … Even if they did, the complaint does not seek an award of covered damages under the policy. Plaintiff[sic] seeks only statutory penalties, punitive damages, costs of suit and injunctive relief. Under these circumstances, the policy will not respond to any damages or verdict which may be rendered resulting from the allegations contained in this complaint.

*Id.* at 4. This letter also contained a reservation of rights provision. *Id.*

Thereafter, on August 3, 2007, Travelers forwarded a letter to Whole Enchilada's counsel reiterating its position as to coverage. (Docket No. 12, Exh. H). Said letter states that the policy language under the standard insuring agreement pertaining to "personal and advertising injury" is inapplicable, insofar as the WEB XTEND endorsement "deletes coverage B of the ISO form in its entirety and replaces it with the language in the endorsement." (Docket No. 12, Exh. H at 1).

> Among other things, the endorsement separates the offenses of 'personal injury' and 'advertising injury'. It also adds a third offense of 'website injury'. All three offenses are defined to include the 'oral, written or electronic publication of material that appropriates a person's likeness,

---

[7] The letter, filed at Exhibit G to Whole Enchilada's motion for summary judgment is not dated. (Docket No. 12, Exh. G). It is, however, date stamped as received on May 7, 2007 by Whole Enchilada's broker. *Id.* The Court notes that, in its motion, Whole Enchilada contends that only its broker and neither Docherty, nor Whole Enchilada's counsel, received this letter, and, as a result of the "contradictions" in the May 3 and May 7 letter, it incurred additional expenses. (Docket No. 9 at 9). However, both the May 3 and May 7 letter contain the above mentioned reservations of rights provisions. (Docket No. 12, Exh. F; Exh. G).

> unreasonably places a person in a false light or gives unreasonable publicity to a person's private life.

(Docket No. 12, Exh. H at 1). The letter further clarifies that the *Reed* complaint alleges no offenses that fall within the offenses covered under the WEB XTEND endorsement. *Id*. The letter also contains the following reservation:

> [t]his letter does not, nor is it intended to, waive any of the rights Travelers may have under the terms of the insurance policy issued to Whole Enchilada, Inc. or at law. This letter is not intended to be an exhaustive statement of all of the exclusions or conditions which may be applicable. All rights which Travelers may have under the terms of the insurance policy issued to Whole Enchilada, Inc. and at law are specifically reserved. We expressly do not waive our right to deny coverage for any other valid reason. …

*Id*. at 2.

In response to Travelers' August 3 letter, Whole Enchilada's counsel sent a letter to Travelers explaining its position with respect to coverage. Specifically, in the letter Whole Enchilada contends:

> [o]ne of the principal offenses for which both the WEB XTEND endorsement and the ISO form provide liability coverage concerns violations of individual privacy. Whether that coverage is couched in terms of unreasonable publicity given to a person's private life or of the misappropriation of a person's likeness (as it is in the WEB XTEND endorsement), or in terms of violation of a person's right of privacy (as in the ISO form), the manifest purpose of the coverage is to protect the insured from liability predicated on exposure or appropriation of an individual's identity and private affairs, including private financial affairs.

(Docket No 12, Exh. J at 3).

## STANDARD

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that

the moving party is entitled to judgment as a matter of law." *Woodside v. School Dist. of Philadelphia Bd. of Educ.*, 248 F.3d 474, 477 (3d Cir. 2001) (citations omitted).  In deciding a summary judgment motion, the court must "view the evidence … through the prism of the substantive evidentiary burden" to determine "whether a jury could reasonably find either that the plaintiff proved his case by the quality and quantity of the evidence required by the governing law or that he did not." *Anderson v. Consolidated Rail Corp.*, 297 F.3d 242, 247 (3d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986)).

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing'- that is, pointing out to the District Court- that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If the moving party has carried this burden, then the burden shifts to the non-moving party who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993).  Thus, the non-moving party cannot rest on the pleadings, but instead must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), and cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a motion for summary judgment.  *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (citing *Celotex*, 477 U.S. at 325 (1986)).  The non-moving party must respond "by pointing to sufficient cognizable evidence to create material issues of fact concerning every element

as to which the non-moving party will bear the burden of proof at trial." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.2d 639, 643 n. 3 (3d Cir. 1998) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 n. 1 (3d Cir. 1994).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in [their] favor.'" *Marino v. Industrial Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255 (1986)); *see also Doe v. County of Centre, PA*, 242 F.3d 437, 446 (3d Cir. 2001) (proving that "a court must take the facts in the light most favorable to the nonmoving party, the [plaintiffs], and draw all reasonable inferences in their favor") (citation omitted).

## ARGUMENTS PRESENTED

In its reservation of rights letter (dated August 3, 2007) and Brief in Support of Motion for Summary Judgment, Travelers asserts that it does not have a duty to defend the *Reed* litigation based on the language of the WEB XTEND endorsement. (Docket No. 12, Exh. F; Docket No 26 at 3-4). Specifically, Travelers denied coverage under the "personal injury" provisions in the policies based on the following:

(1) The Reed Complaint alleges no violation of privacy as is required by the endorsement because it alleges no "publication" and no "publicity". Therefore, the complaint alleges no "publicity to private" life and does not fall within coverage.

(2) The Reed Complaint alleges no "publication" or "appropriation" of Reed's "likeness."

(3) The Reed Complaint does not allege "injury" or "damage" potentially within the policy's personal injury coverage.

(Docket No. 26 at 3-4). Conversely, in its Motion for Partial Summary Judgment and Reply to Travelers' Motion for Summary Judgment, Whole Enchilada argues that Travelers does, as a matter of law, have a duty to defend under the personal injury provisions in the policy:

(1) The Reed Complaint alleges publication as defined by the endorsement.

(2) The Reed Complaint alleges unreasonable publicity to a person's private life and the appropriation of a person's likeness as provided by the policy.

(3) The Reed Complaint seeks "damages" within the meaning of the policy.

(Docket No. 9 at 12-19).

## ANALYSIS

### I.     Choice of Law

A federal court sitting in diversity jurisdiction must apply the substantive law of the forum state, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64,78 (1938), including its choice of law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Under Pennsylvania choice of law rules, the law of the place where an insurance policy was issued and delivered governs the interpretation of an insurance contract. *Pittsburgh Bridge & Iron Works v. Liberty Mutual Insurance Co.*, 444 F.2d 1286, 1288 n. 2 (3d Cir. 1971). Here, the policies at issue were issued and delivered by Travelers to Whole Enchilada in Pennsylvania through Whole Enchilada's broker. (Docket No. 12, Exhs. C, D). Therefore, under Pennsylvania choice of law rules, Pennsylvania law will apply to this action.

Furthermore, as the policies at issue are silent as to governing law, and both parties appear to implicitly agree that Pennsylvania law applies, the Court need not engage further in a choice of law analysis. *See Rochez Bros., Inc. v. North American Salt Co., Inc.*, Civ. A. No 9401141, 1994 WL 7355932 at *6 n. 8 (W.D. Pa. 1994) (citing *Schiavone Construction Co. v. Time, Inc.*, 735 F.2d 94, 96 (3d Cir. 1984)).

## II.     Construction of an Insurance Policy

Under Pennsylvania law, interpretation of an insurance contract is a question of law that is properly decided by the court. *Gardner v. State Farm Fire and Casualty Co.*, --- F.3d ---, 2008 WL 2805641 at * 10-11 (3d Cir. 2008) (citing *Donegal Mutual Insurance Co. v. Baumhammers*, 938 A.2d 286, 290 (Pa. 2007) (quotations omitted)); *see also Liberty Mutual Insurance Co. v. Treesdale, Inc.*, 418 F. 3d 330, 334 (3d Cir. 2005); *Reliance Insurance Co. v. Moessner*, 121 F.3d 895, 900 (3d Cir. 1997). Because no Pennsylvania court has ruled as to whether an alleged FACTA violation falls within similar general commercial liability policy language, this Court must predict how the Pennsylvania Supreme Court would decide this issue. *See, e.g., Carey v. Employees Mutual Casualty Co.*, 189 F.3d 414, 418 (3d Cir. 1999); *New York Life Insurance Co. v. Johnson*, 923 F.2d 279, 280 (3d Cir. 1991).

When interpreting an insurance contract, the court must determine the intent of the parties "as manifested by the language of the written agreement." *Travelers Casualty & Surety Co. v. Castegnaro*, 772 A.2d 456, 459 (Pa. 2001); *see also Norfab Corp. v. Travelers Indemnity Co.*, 555 F.Supp. 2d 505, 509 (E.D. Pa. 2008) (citing *401 Fourth St., Inc. v. Investors Insurance Group*, 879 A.2d 166, 171 (Pa. 2005)). Where the language of the policy is clear and unambiguous, the court must give effect to the plain language of

the agreement.  *Id.* at 459 (citing *Bateman v. Motorists Mutual Insurance Co.*, 590 A.2d 281, 283 (Pa. 1991); *Standard Venetian Blind Co. v. American Empire Insurance Co.*, 469 A.2d 564 (Pa. 1983); *Gardner*, 2008 WL 2805641 at * 11 (citing *Donegal Mutual Insurance Co.*, 938 A.2D AR 290) (quotations omitted)).  An ambiguity exists when there is more than one possible interpretation or if the contract is susceptible to more than one possible construction.  *Medical Protective Co. v. Watkins*, 198 F.3d 100, 104 (3d Cir. 1999); *McMillan v. State Mutual Life Assur. Co. of America*, 922 F.2d 1073, 1077 (3d Cir. 1990).  "The Court cannot . . . distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity. The polestar of our inquiry, therefore, is the language of the insurance policy.  Additionally, an ambiguity does not exist simply because the parties disagree on the proper construction … Courts should read policy provisions to avoid an ambiguity if possible."  *O'Connor-Kohler v. United Services Auto. Ass'n.*, 883 A.2d 673, 679 (Pa. Super. 2005) (citing *Neuhard v. Travelers*, 831 A.2d 602, 604-05 (Pa. Super. 2003) (citations omitted)).  When an ambiguity exists in a provision of an insurance policy, the provision must be construed in favor of the insured and against the insurer. *Medical Protective Co.*, 198 F.3d at 103; *St. Paul Fire & Marine Insurance Co. v. Lewis*, 935 F.2d 1428, 1431 (3d Cir. 1991).  Furthermore, in construing the terms of an insurance policy, the court must read the policy in its entirety, "in a manner that gives effect to all of the policy language if at all possible." *Millers Capital Insurance Co. v. Gambone Bros. Development Co. v. State Farm Insurance Co.*, 766 A.2d 626, 631 (Pa. Super. 1998) (citations omitted).  "The Court should not consider individual terms removed from their context, but should instead consider the entire

contractual provision to determine the intent of the parties." *Norfab*, 555 F.Supp. 2d at 509 (citing *401 Fourth St.*, 879 A.2d at 171).

In construing the language of an insurance policy, the Court must give effect to the reasonable expectations of the insured. *Miller*, 941 A.2d at 717 (citing *Bubis v. Prudential Property & Casualty Co.*, 718 A.2d 1270, 1272 (Pa. Super. 1998)). The "reasonable expectations" doctrine is "intended to protect against the inherent danger, created by the nature of the insurance industry, that an insurer will agree to certain coverage when receiving the insured's application, and then unilaterally change those terms when it later issues a policy." *Moss Signs, Inc. v. State Auto Mutual Insurance Co.*, Civil Action No. 08- 164, 2008 WL 892032 at *2 (quoting *UPMC Health System v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir.2004)). While Travelers argues that the reasonable expectations doctrine is inapplicable in this case, insofar as Whole Enchilada is a sophisticated insured, (*see* Docket No. 36 at 5), the United States Court of Appeals for the Third Circuit has predicted that the Supreme Court of Pennsylvania would find that the reasonable expectations doctrine applies to sophisticated commercial purchasers of insurance. *UPMC Health System*, 391 F.3d at 502. However, the Court of Appeals further held that "status as a sophisticated purchaser is a factor to be considered when resolving whether the insured acted reasonably in expecting a given claim to be covered." *Id.* (citing *Reliance*, 121 F.2d 895, 906 (3d Cir. 1977)). Moreover, an "insured may not complain that its reasonable expectations have been frustrated when the applicable policy limitations are clear and unambiguous." *Miller*, 941 A.2d at 717 (citing *Bubis v. Prudential Property & Casualty Insurance Co.*, 718 A.2d at 1270, 1272 (Pa. Super. 1998); *Bateman v. Motorists Mutual Insurance Co.*, 590 A.2d 281, 283 (Pa. 1991); *Neill*

*v. Allstate Ins. Co.*, 549 A.2d 1034 (Pa. 1988); *St. Paul Mercury Insurance Co. v. Corbett*, 630 A.2d 28 (Pa. 1993) (en banc)). Further the Court must not, in the context of a commercial insurance policy, look beyond the plain language of the agreement in order to give effect to the insured's expectations where the language of the contract is clear and unambiguous. *Canal Insurance Co. v. Underwriters at Lloyd's London*, 435 F.3d 431, 440 (3d Cir. 2006) (citing *Matcon Diamond v. Pennsylvania Nat'l Ins. Co.*, 815 A.2d 1109, 1114 (Pa. 2003); *Liberty Mutual Insurance Co. v. Treesdale*, 418 F.2d 330, 344 (3d Cir. 2005)).

## III.    Application of WEB XTEND Endorsement

Under Pennsylvania law, an endorsement "will be considered part of the insurance contract if it appears that the parties intended that is should be so considered." *Young v. U.S. Fidelity & Guaranty Co.*, 445 A.2d 542, 544 (Pa. Super. 1982) (citing COUCH ON INSURANCE 2d, § 4:32 (1959 and Supp. 1980)); *see also* COUCH ON INSURANCE 3d, § 18:17 (2005) ("When properly incorporated into the policy [by reference or attachment] the policy and the … endorsement together constitute the contract of insurance and are to be read together to determine the contract actually intended by the parties."); *Rorer Group, Inc. v. Insurance Co. of North America*, 655 A2d 123 (Pa. Super. 1995); *Herberwood Fuel Co. v. Manor Real Estate Co.*, 192 A.2d 253, 255 (Pa. 1963) (holding that the "whole policy, including the endorsement must be considered in determining the liability of the insurance company and the risk the policy was issued to cover"). "Additionally, rules of construction have developed to meet the situation where an endorsement has been added to the terms of the general policy. If there is a conflict between the terms of the endorsement and those in the body of the main

policy, then the endorsement prevails, particularly when it favors the insured." *St. Paul Fire and Marine Insurance Co. v. U.S. Fire Insurance Co.*, 655 F.2d 521 (3d Cir. 1981) (citing *Lumbermens Mutual Casualty Co. v. Sutch*, 197 F.2d 79, 81-82 (3d Cir. 1952)) (citations omitted).

There appears to be no dispute that the WEB XTEND endorsement pertained to both policies as issue, and for the respective policy periods. However, Whole Enchilada contends that it is entitled to coverage under Coverage "B" of the Standard Agreement. It further argues that Travelers improperly attempts to limit coverage under the WEB XTEND endorsement, given that the endorsement purports to extend, not narrow, the coverage provided by the standard insuring agreement. (Docket No. 9 at 2; Docket No. 32 at 5). Specifically, Whole Enchilada argues:

> [T]his coverage was provided pursuant to a "WEB XTEND" endorsement, which was represented as an extension of coverage. Without the WEB XTEND endorsement, Travelers' standard policy form covered violations of a person's 'right of privacy.' Hence, the standard form would have covered this claim. To deny coverage under the WEB XTEND endorsement would yield the perverse result that an endorsement purporting to "extend" coverage instead (i) fundamentally narrowed it and (ii) did so <u>sub</u> <u>silentio</u>.

(Docket No. 9 at 2-3) (emphasis in original). Furthermore, Whole Enchilada asserts that it received no disclosure stating that the endorsement in any way restricts coverage. (Docket No. 32 at 5). Travelers, in response, argues that the WEB XTEND endorsement effectively changed the terms of the policy by replacing the Coverage "B" provision of the Standard Agreement. (Docket No. 26 at 28) ("The endorsement clearly, and indeed conspicuously, states that it 'CHANGES THE POLICY.'") Travelers further argues:

> [e]ven if it could read out of the policy the WEB XTEND Liability Endorsement, [Whole Enchilada] would still need to prove coverage under Coverage B of the Standard Agreement. … Apart from any other policy requirement, the starting point for Whole Enchilada's "unquestionable coverage" argument would be the basic form's provision that the alleged conduct must "violate a person's right of privacy." … [T]he Reed Complaint alleges no violation of any right of privacy.

(Docket No. 26 at 29).

As to whether the WEB XTEND endorsement effectively changes the terms of the policy, the Court here agrees with Travelers that the endorsement effectively replaces the terms of Coverage "B":

The WEB XTEND endorsement provides as follows:

THIS ENDORSEMENT CHANGES THE POLICY, PLEASE READ IT CAREFULLY.
**WEB XTEND LIABILITY**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART PROVISIONS

Paragraph o. Personal and Advertising Injury, Part
2. Exclusions of SECTION I- COVERAGES,
COVERAGE A BODILY INJURY AND PROPERTY
DAMAGE LIABILITY is deleted and replaced by the following:

o. Personal Injury, Advertising Injury and Web
Site Injury

"Bodily Injury" arising out of "personal injury"
"advertising injury" or "webite injury".

**COVERAGE B. PERSONAL INJURY, AD-**
**VERTISING LIABILITY (SECTION I- COVERAGES)** is
Deleted in its entirety and replaced by the following:

**COVERAGE B. PERSONAL INJURY, AD-**
**VERTISING INJURY AND WEB SITE INJURY**
**LIABILITY**
    **1.**    **Insuring Agreement.**
        **a.**  We will pay for those sums that the insured be-

comes legally obligated to pay as damages because of "personal injury", "advertising injury" or "web site injury" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "personal injury", "advertising injury", or "web site injury" to which this insurance does not apply. …

## SECTION V- DEFINITIONS

**ADVERTISEMENT**

The definition of **"Advertisement"** (Section V- DEFINITIONS) is deleted in its entirety and replaced by the following:

1. "Advertising injury" means injury, arising out of one or more of the following offenses: …

… **b.** Oral, written or electronic publication of material that appropriates a person's likeness, unreasonably places a person in a false light or gives unreasonable publicity to a person's private life; or …

**Personal Injury**

The definition of **"Personal Injury"** (Section V- DEFINITIONS) is deleted in its entirety and replaced by the following:

"Personal injury" means injury, other than "bodily injury" arising out of one or more of the following offenses: …

**e.** Oral, written or electronic publication of material that appropriates a person's likeness, unreasonably places a person in a false light or gives unreasonable publicity to a person's private life.

(Docket No. 12, Exh. C at 25- 27; Exh. C at 25-28).

The WEB XTEND endorsement unambiguously states that the endorsement "changes the policy." The plain language of the endorsement provides that the endorsement modifies insurance provided under Coverage "B". There is no ambiguity in the language purporting to change the Coverage "B" provisions of the standard insuring agreement, which provides: "[t]his endorsement modifies insurance provided under the following: … Coverage "B" Personal and Advertising Injury (Section I Coverages) … this section is deleted in its entirety and replaced …" (Docket No. 12, Exh. C at 25). While there is a dispute between the parties as to whether the endorsement purports to extend or narrow coverage, the Court must look at the plain language of the agreement, *Castegnaro*, 772 A.2d at 459, and finds that the plain language of the endorsement also unambiguously extends coverage, insofar as the endorsement itself is named "WEB *XTEND*" (emphasis added). The endorsement changes the language of the standard insuring agreement to include insurance coverage for "website injury." (Docket No. 12, Exh. C at 25) (Coverage "B" coverage for advertising and personal injury was deleted and changed to include coverage for "damages because of 'personal injury,' 'advertising injury' or 'web site injury' to which this insurance applies").

Furthermore, under Pennsylvania law, the Court must read the endorsement as part of the contract between the parties. *Young*, 445 A.2d at 544. When there is a conflict between the terms of the policy and the endorsement, the endorsement will prevail. *St. Paul Fire & Marine*, 655 F.2d at 525. Therefore, if there is any conflict between the terms of Coverage "B" and the coverage terms of the WEB XTEND endorsement, the endorsement prevails and effectively changes the terms of the standard insuring agreement. Here, there is a conflict between the standard insuring agreement and the

endorsement, in particular regarding coverage for personal and advertising injury, insofar as Coverage "B" provides, in relevant part:

**Section V- DEFINITIONS**

> **14**. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses: …
>
> > … **e.** Oral or written publication, in any manner, or material that violates a person's right of privacy; …

The endorsement, in contrast provides, in relevant part:

> The definition of **"Personal Injury"** (Section V-DEFINITIONS) is deleted in its entirety and replaced by the following:
>
> "Personal injury" means injury, other than "bodily injury" arising out of one or more of the following offenses: …
>
> > **e.** Oral, written or electronic publication of material that appropriates a person's likeness, unreasonably places a person in a false light or gives unreasonable publicity to a person's private life.

Under Pennsylvania law, the language of the endorsement prevails and the terms of the endorsement determine coverage, and effectively change the terms of the standard insuring agreement. *Id.; see also* COUCH ON INSURANCE, § 18:17.[8]

---

[8] Moreover, in regard to the applicability of the endorsement, the Court notes that the policies were issued by Travelers to Whole Enchilada in July of 2005 and 2006, respectively. Therefore, both policies were issued after December 4, 2004, *i.e.*, after FACTA became effective. "A contract incorporates the laws that exist at the time the contract is made, and a contract will be construed according to the law of the state", as interpreted by its courts, at the time the contract was made. *AK Steel Corp. v. Viacom*, 835 A.2d 830 (Pa. Super. 2003) (quoting *Reif v. Reif*, 626 A.2d 169 (Pa.Super. 1993)).

Furthermore, while credit must be given to the reasonable expectations of the insured, *see Miller*, 941 A.2d at 717, the insured here is a corporation owning several properties, which purchased the policies through a broker and is represented by corporate counsel. (Docket No. 12, Exh. C, D). [9] Whole Enchilada could not reasonably expect, based on the plain language of the endorsement, that said endorsement did not effectively change the terms of the standard insuring agreement, particularly Coverage "B". Having found that the WEB EXTEND endorsement governs potential coverage under the policies, the Court turns its attention to a discussion of Travelers' potential duty to defend or indemnify under the terms of the endorsement.

## III.    Duty to Defend vs. Duty to Indemnify

### A.    Duty to Defend

Under Pennsylvania law, the duty to defend is broader than an insurer's duty to indemnify. *Erie Insurance Exchange v. Muff*, 851 A.2d 919, 925 (Pa. Super. 2004). An insurer's duty to defend is determined by the allegations in the underlying complaint. *Id.*

---

Furthermore, the Court opines that Travelers' underwriter knew or should have known of the existence of FACTA, and the policy would have been written against that backdrop. However, because the parties chose not to complete discovery, the Court is not privy to any information pertaining to the drafting of the policies, or the intentions of the underwriter in changing the terms of Coverage "B". Nor does the Court have before it any information from the broker or the insured. The Court has only what the parties have offered on the record as evidence of the parties' intentions, i.e., the policies. Under the plain language of the policies, the Court finds that the language of the endorsement unambiguously changes the terms of the standard insuring agreement.

[9]    In particular, Whole Enchilada used the brokerage firm of Simpson and McCready, LLC (Docket No. 12, Exh. C at 1 of 1). Whole Enchilada's use of a broker impugns Whole Enchilada's argument that it could not reasonably expect that the WEB XTEND endorsement would apply, (Docket No. 9, at 18) (" ... Travelers did not even bother to mention (and, given Travelers' interpretation, hid) within the endorsement"), insofar as its broker was in a position to inform Whole Enchilada of the application of the endorsement.

at 926; *Cincinnati Insurance Co. v. Pestco, Inc.*, 374 F.Supp. 2d 451 (W.D. Pa. 2004) (citing *Gene's Restaurant, Inc. v. Nationwide Insurance Co.*, 548 A.2d 246 (Pa. 1988)); *see also Erie Insurance Exchange v. Claypoole*, 673 A.2d 348, 355 (Pa. 1996) ("In such actions, the allegations raised in the underlying complaint alone fix the insurer's duty to defend"); *Cadwallader v. New Amsterdam Casualty Co.*, 152 A.2d 484, 488 (Pa. 1959). In determining whether an insurer has a duty to defend, the Court must compare coverage afforded under the policy with the factual allegations contained in the four corners of the complaint. *Mutual Benefit Insurance Co. v. Haver*, 725 A.2d 743, 745 (Pa. 1999). An insurer has a duty to defend the insured "when the allegations in the complaint against [the insured] could potentially fall within the coverage of the policy." *Air Products and Chemicals, Inc. v. Hartford Accident and Indemnity Co.*, 25 F. 3d 177 (3d Cir. 1994) (citing *Gedeon v. State Farm Mutual Auto Insurance Co.*, 188 A.2d 320 (Pa. 1963); *Cadwallader v. New Amsterdam Casualty Co.*, 152 A.2d 484 (Pa. 1959); *Willson v. Maryland Casualty Co.*, 105 A.2d 304 (Pa. 1954)); *Cincinatti Insurance Co. v. Pestco, Inc.*, 374 F.Supp. 2d at 457 (citing *Biborosch v. Transamerica Insurance Co.*, 603 A.2d 1050, 1052 (Pa. 1992)). Moreover, while the allegations in the underlying complaint will trigger a duty to defend, "the particular cause of action that a complainant pleads is not determinative of whether coverage has been triggered. Instead, it is necessary to look at the factual allegations contained in the complaint." *Mutual Benefits Insurance Co. v. Haver*, 725 A.2d 743, 745 (Pa. 1999) (citing *Scopel v. Donegal Mutual Insurance Co.*, 698 A.2d 602 (Pa. Super. 1997); *Aetna Casualty and Surety Co. v. Roe*, 650 A.2d 94, 98 (Pa. 1994)).

### B.    Duty to Indemnify

An insurer's duty to indemnify is separate and distinct from its duty to defend. *Key Handling Systems, Inc. v. W.C.A.B.*, 729 A.2d 109, 116 (Pa. 1999) (citing *Zeitz v. Zurich Gen. Accident & Liabilty Insurance Co.*, 67 A.2d 742, 746 (Pa. Super. 1949)). However both the duty to defend and the duty to indemnify "flow from a determination that the complaint triggers coverage." *General Accident Insurance Co. of America v. Allen*, 692 A.2d 1089, 1095 (Pa. 1997). Under Pennsylvania law, an insurer will have a duty to indemnify "only where the insured is held liable for a claim *actually* covered by the policy." *USX Corp. v. Adriatic Insurance Co.*, 99 F.Supp. 2d 593 (W.D. Pa. 2000) (emphasis added) (citing *Allen*, 692 A.2d at 1095); *see also Winner Intern. Corp.v. Continental Casualty Co.*, 889 F.Supp. 809, 816 (citing *Allstate Insurance Co. v. Brown*, 834 F.Supp. 854, 857 (E.D. Pa. 1993)) and *West American Insurance Co. v. Lindepuu*, 128 F.Supp. 2d 220, 225 ("An insurer's obligation to defend an action is not necessarily coextensive with its obligation to indemnify … The duty to indemnify is more limited and arises only if it is established that the insured's damages actually are covered by the terms of the policy.") (internal citations omitted). An insurer will have a duty to indemnify when liability against the insured is conclusively established. *USX Corp.*, 99 F. Supp. 2d at 612 (citations omitted).

### V.    Travelers' Alleged Duty to Defend the Reed Litigation

Whole Enchilada argues that the *Reed* Complaint triggers a duty to defend under the personal injury provision of the WEB XTEND endorsement. (Docket No. 9). Specifically, Whole Enchilada argues that, in interpreting liability coverage for personal

injury, the Court should not read the policy so narrowly as to cover only the common law tort meaning of the provisions providing coverage for personal injury. (Docket No. 32 at 12-13) (citing *Granite State Insurance Co. v. Aamco Transmission*, Inc., 57 F.3d 316 (3d Cir. 1995)).

Pennsylvania courts have held that personal injury coverage under a commercial liability policy is not limited to the common law tort meaning of a policy's language. In *Granite State Insurance Co. v. Aamco Transmission, Inc.*, 57 F.3d 316 (3d Cir. 1995), for example, the Third Circuit, in interpreting Pennsylvania law held that the term "unfair competition" in a liability insurance policy did not unambiguously refer to the common law tort of unfair competition. Rather, the Court held, "a person reading the term 'unfair competition' as a category of 'advertising injury' within an insurance policy would not necessarily understand the term to be limited to a common law definition." *Id.* at 319. Furthermore, the Court held that a cause of action under Pennsylvania statutory law *could* fall within the policy's coverage for "unfair competition." However, the Court there ultimately held that it would have been unreasonable for the insured in that case to expect coverage under the terms of the policy. *Id.* at 321. Therefore, the Court ultimately held that, while a statutory violation *could* fall within the policy language naming a common law cause of action, said statutory violation must still be reasonable under the policy language and must not go beyond the plain meaning of the policy language. *Id.*

Likewise, in this case, while the Court agrees that a statutory violation under FACTA *could potentially* fall within the personal injury provisions at issue, the alleged statutory violation must still trigger coverage under the plain language of the policy. *Granite State*, 57 F.3d at 321; *see also Cincinatti Insurance Co. v. Pestco, Inc.*, 374

F.Supp. 2d 451, 459 (W.D. Pa. 2004); NORTON ON INSURANCE COVERAGE IN PENNSYLVANIA § 15.E(4). Here, the policies provide coverage for personal injury "… arising out of … oral, written or electronic publication of material that appropriates a person's likeness … or gives unreasonable publicity to a person's private life." (Docket No. 12 Exh. C at 25-17; Exh. D at 25-28).

In interpreting the provisions of "personal injury" under a commercial liability policy, the Pennsylvania Superior Court has held that a :

> personal injury endorsement extends liability coverage to the specific torts there enumerated.  It affords coverage only for defined risks.  These include torts of a recognized type involving damages which can be lumped under the descriptive term personal injury.

*O'Brien Energy Systems, Inc*. *v*. *American Employers' Insurance Co*., 629 A.2d 957, 964 (Pa. Super. 1993). While Whole Enchilada urges this Court not to construe coverage for "personal injury" narrowly, i.e., as merely the common law meaning of "appropriation of a person's likeness" and "material that gives unreasonable publicity to a person's private life," (Docket No. 32 at 12-14), the Court finds that the policy enumerates specific elements of causes of action that must be plead in the Complaint in order to trigger coverage.  (Docket No. 12, Exhs. C, D); *see* NORTON ON INSURANCE COVERAGE § 15.E (4). Hence, the Court must read the policy against the allegations in the *Reed* Complaint to determine whether the allegations in the Complaint trigger coverage for publication of "material that appropriates a person's likeness … or gives unreasonable publicity to a person's private life" under the plain meaning of those terms.  *See Mutual Benefits Ins*. *Co*., 725 A.2d at 725.

A.      *"Publication"*

Whole Enchilada argues that the *Reed* Complaint alleges "publication" (1) of "material that appropriates a person's likeness" and (2) material that "gives unreasonable publicity to a person's private life" and, therefore, it is entitled to coverage for the *Reed* Complaint under the terms of the WEB XTEND endorsement:

> Travelers cannot avoid its obligation to provide coverage for claims 'arising out of … [o]ral, written or electronic publication of material that … gives unreasonable publicity to a person's private life.' … [T]he policies embrace statutorily created offenses that fall within the scope of the Policies' terms. … According to the Reed Complaint, Whole Enchilada allegedly published receipts that, in Congress' judgment, improperly divulged too much personal financial information and revealed the cardholder's financial identity.

(Docket No. 32 at 5).

Admittedly, the policy provides coverage for personal injury arising out of "oral, written or electronic publication of material …" There appears to be no dispute that the printing of a receipt is "written material." However, there is an issue as to whether the printing of a receipt is written "publication" for purposes of coverage. In response to Whole Enchilada's argument that the *Reed* Complaint sufficiently alleges "publication," Travelers argues that the *Reed* Complaint fails to allege "publication" under the plain meaning of that term, as interpreted under Pennsylvania law. (Docket No. 26 at 14). Specifically, Travelers contends "publication cannot mean handing a receipt to a single person; nor can it mean handing a receipt to someone who already knows the information printed on it." (Docket No. 26 at 14).

Whole Enchilada, however, contends that the *Reed* Complaint alleges publication, insofar as the Complaint avers that Whole Enchilada printed the last five digits of the *Reed* plaintiffs' credit or debit card number and/ or printed the expiration date in violation

of FACTA, thereby exposing the *Reed* plaintiffs to the potential of identity theft. (Docket No. 9 at 12-13). Therefore, Whole Enchilada argues, the Complaint triggers a duty to defend under the terms of the endorsement. (Docket No. 9 at 12) ("The alleged violation of FACTA arises out of the printing of a credit card receipt that does not truncate the requisite, private information. Consistent with the *Reed* Complaint, the printing of such a receipt in a restaurant makes this private information public. By definition, this is a publication. Courts have routinely rejected the argument that publication to the cardholder, rather than to a specific third party is not publication.") (citing *Park University Enterprises, Inc. v. American Casualty Co. of Reading*, 442 F.3d 1239, 1248-1250 (10th Cir. 2006)).

The policy provides coverage for "oral, written or electronic publication of material …" The word "publication" is not defined by the policy. Accordingly, Whole Enchilada argues that the meaning of "publication" appears to be ambiguous as applied to a FACTA violation, insofar as some courts have interpreted "publication" to mean providing information to one individual alone, as opposed to the public at large. (Docket No. 9 at 12).

"When interpreting the language of an insurance policy, the words must be construed in their 'natural, plain and ordinary sense.'" *Tyler v. Motorists Mutual Insurance Co.*, 779 A.2d 528, 530 (Pa. Super. 2001) (citing *Riccio v. American Republic Insurance Co.*, 705 A.2d 422, 426 (Pa. 1997). Where the policy term is not defined, the Court may refer to the dictionary definition of the word. *Id.* at 530 (citing *Madison Construction Co. v. Harleyville Mutual Ins. Co.*, 735 A.2d 100, 106 (1999)).

The plain meaning of the term publication is found under "publish": "1. a.: to make generally known b.: to make public announcement of; 2. a. to disseminate to the public b: to produce or release for distribution." MERRIAM-WEBSTER DICTIONARY, ON-LINE ED. (2008) (last visited September 29, 2008). Black's Law Dictionary defines "publication" as "1. Generally, the act of declaring or announcing to the public." BLACK'S LAW DICTIONARY, 8th Ed. at 1261 (2004). In this case, the *Reed* Complaint alleges that "[Whole Enchilada], *at the point of a sale or transaction with members of the class*, provided … one or more electronically printed receipts on each of which Defendants printed, for each respective class member, more than the last five digits of such member's credit card or debit card number …" (Docket No. 12, Exh. B at ¶ 68) (emphasis added). As such, the Complaint alleges only that the information printed on the receipt was handed to the class member at the point of sale and does not allege that the cardholder's information was in any way made generally known, announced publicly, disseminated to the public, or released for distribution. A receipt is a record of a point of sale transaction, and, as the Complaint alleges, is "provided to" the cardholder. (*See* Docket No. 12, Exh. B at ¶ 55). The Complaint only alleges that the information was provided to Reed and the class members in violation of FACTA. *Id*. It does not allege that Whole Enchilada is liable for "publication,"[10] as the printed receipts are not made generally known, publicly announced, nor disseminated to the public. The Court finds that there is no coverage for the *Reed* litigation under the provision that provides

---

[10] The Court notes that while, at certain portions of the *Reed* Complaint, the word "publication" is used, the Court must look to the actual factual allegations of the complaint, and not merely the words used in the complaint. *Mutual Ben. Ins. Co. v. Haver*, 725 A.2d 743, 745 (1999).

coverage for "publication of material that appropriates a person's likeness … or gives unreasonable publicity to a person's private life, insofar as there is no allegation of "publication."

To the extent that Whole Enchilada maintains coverage exists if publication is read to mean production or release for distribution, the Court finds that argument to be unpersuasive. Indeed, under the plain language of this policy, there is no ambiguity in the meaning of "publication," when the word is read in the context of the entire personal injury provision. In this case, "publication" must be read in the context of the language that comes before and after. *See Millers Capital Ins. Co.*, 941 A.2d at 715. Therefore, in order to trigger a duty to defend, the underlying Complaint must allege:

e.   Oral, written or electronic *publication of material that appropriates a person's likeness*, unreasonably places a person in a false light *or gives unreasonable publicity to a person's private life*.

(Docket No. 12, Exh. C at 25-27; Exh. D at 25-28) (emphases added).

### B.   *"Publication of Material that Appropriates a Person's Likeness"*

The policy first provides coverage for "oral or written publication of material that appropriates a person's likeness." (Docket No. 12, Exh, C at 25- 27; Exh. D at 25- 28). Whole Enchilada argues specifically:

An individual's private financial information is part and parcel of his or her "identity." Thus, the central thrust of the *Reed* Complaint-appropriation of private financial information- is directed to the central interest protected by the statute- the interest of the individual in the exclusive use of his or her own identity, or "likeness."

(Docket No. 9 at 15).

While Whole Enchilada's argument here is thought-provoking, it stretches, not only beyond the plain language of the policy, as well as settled Pennsylvania law, it also stretches beyond any reasonable expectation of coverage under this provision. The term "appropriation of a person's likeness" is unambiguous. Appropriation of a person's likeness, by definition under Pennsylvania law, is use of a person's actual physical likeness to the benefit of the defendant without permission. RESTATEMENT 2d TORTS § 652C; *see also Seal v. Gramercy Pictures*, 964 F.Supp. 918 (E.D. Pa. 1997), *aff'd*, 156 F.3d 1225 (3d cir. 1998). The plain meaning of "likeness" is "appearance or semblance." MERRIAM- WEBSTER DICTIONARY, ON-LINE ED. (2008) (last visited September 29, 2008). Here, there is no allegation that Whole Enchilada appropriated Reed's semblance or likeness. (Docket No. 12, Exh. B). Furthermore, even if financial identity equated with a person's "likeness" as Whole Enchilada suggests, the *Reed* Complaint alleges no appropriation, i.e. use of that information by Whole Enchilada or anyone else for his own financial benefit, without Reed's permission. Rather, the Complaint alleges a violation of the truncation provision of FACTA:

> A main provision of FACTA … provides that:
>
> No person that accepts credit cards or debit cards for the transaction of business shall print more than the last five digits of the card number or expiration date upon any receipt provided to the cardholder at the point of sale or transaction …
>
> … [Whole Enchilada] ha[s] willfully violated this law and *failed to protect* [Reed] and others similarly situated against identity theft and credit card and debit card fraud by continuing to print more than the last five digits of the card number and/ or the expiration date on the receipts provided to debit card and credit cardholders transacting business with [Whole Enchilada].

(Docket No. 12, Exh. B at ¶¶ 2-3) (emphasis added).  The Complaint alleges only that Whole Enchilada failed to protect Reed from credit or debit card fraud by failing to truncate the requisite numbers, not that Whole Enchilada wrongfully used Reed's information in any way. (Docket No. 12, Exh. B).  The Complaint alleges that, at the point of sale, meaning at the point where Reed handed over his card for purchase, Whole Enchilada used the information for the sale and then handed back information on a receipt.  (Docket No. 12, Exh. B at ¶ 68).  This is not appropriation under the plain meaning of the policy's terms.[11]

    *C.*   *"Publication of material that … gives unreasonable publicity to a person's private life"*

Furthermore, the underlying *Reed* Complaint does not allege "oral, written or electronic publication of material that … gives unreasonable publicity to a person's private life."  There is an issue between the parties as to the meaning of "publicity" under this provision. While the policy does not define the term "publicity" explicitly, like the term "publication," the meaning of the term "publicity" is well defined under Pennsylvania law.  Under Pennsylvania tort law, "publicity" "requires that the matter be

---

[11]  While the *Reed* Complaint makes specific allegations as to the importance of the truncation provision of FACTA to prevent identity theft (Docket No. 12, Exh. B at ¶¶ 42-43), the complaint does not allege that any identity theft occurred.  More specifically, while the *Reed* Complaint discusses the potential threat of identity theft: "a would be identity thief who steals a receipt containing the last four or five digits of a credit card account number and an expiration date can use that data in an attempt to dupe the cardholder," no allegation of any such theft or use of the information "in an attempt to dupe the cardholder" is alleged against Whole Enchilada. (Docket No. 12, Exh. B at ¶ 46).  Further, at the hearing approving the settlement in the underlying class action, (Civ. Action No. 07-00357, Docket No. 53 at 35, 36), this Court was advised that no identity theft had occurred to that date.

made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become public knowledge." *Harris by Harris v. Easton Publishing Co.*, 335 A.2d 1377, 1384 (Pa. Super. 1984) (citing RESTATEMENT 2d of Torts § 652D); *see also Vogel v. W.T. Grant Co.*, 327 A.2d 133 (Pa. 1974). Furthermore, the plain meaning of the term "publicity" is "1. The quality or state of being public; 2. a. an act or device designed to attract public interest; information with news value issued as a means of gaining public attention or support …" MERRIAM-WEBSTER DICTIONARY, ON-LINE ED. (2008) (last visited September 29, 2008). "Public" is defined as "exposed to general view." *Id*.

The underlying complaint must allege factual allegations that fall within the policy language. *Mutual Benefit Ins. Co.*, 725 A.2d at 725. Here, however, the *Reed* Complaint does not allege publication that gives unreasonable publicity to a person's private life. (Docket No. 12, Exh. B). It does not allege that Whole Enchilada displayed the plaintiffs' information to the public or took any action designed to disseminate the information to the public at large. (Docket No. 12, Exh. B). Rather, the Complaint alleges factual allegations stating that the Reed plaintiffs' credit or debit card information was printed on a receipt that was handed back to them, in violation of FACTA. (Docket No. 12, Exh. B at ¶¶ 68-71). While the Complaint alleges that Whole Enchilada printed information, this Court finds it does not allege the kind of public communication to which the term "publicity" refers, thereby triggering coverage.

While Whole Enchilada notes that the enactment of FACTA was to prevent identity theft and further argues that the truncation provision was enacted to protect a privacy right of consumers, (Docket No. 9 at 15-16), the Court notes that a violation of

the truncation provision of FACTA is not, as Whole Enchilada suggests, a publication or an invasion of an individual's privacy right. Rather, the truncation provision is applicable only to electronically printed receipts. Fair Credit Reporting, 2005 Supplement at § 1.4.9.2. It does not prevent a merchant from obtaining credit information from the consumer, as does, for example, the provisions of the Fair Credit Reporting Act, which FACTA amended. *See* 15 U.S.C. 1681; *Id*. at § 16.6.1b. Rather, the truncation provision subjects merchants who willfully fail to enact safety measures, i.e., employing machines that truncate the appropriate amount of debit or credit card numbers, to liability. *Id*. at § 16.6.1a.5.

In the context of the factual scenario surrounding Whole Enchilada's alleged violation of this provision of FACTA, the Court's reasoning becomes clear. At the point of sale transaction, a cardholder gives his or her credit or debit card to the individual at the cash register. The credit information is exchanged between the cardholder, Whole Enchilada and the cardholder's bank. There is no violation of a privacy right, insofar as the cardholder willfully gives over his or her credit information to Whole Enchilada so that the information can be used to process the sale. This factual scenario does not meet the requirement of publicity under the policies.

Furthermore, the case law cited by Whole Enchilada in support of its contention that publicity does not necessarily require some type of dissemination to the public is inapposite to the instant matter. In *Park University Enterprises v. American Casualty Co. of Reading*, 442 F.3d 1239, 1248-1250 (10th Cir. 2006) and *Zurich American Insurance Co. v. Fieldstone Mortgage Co*., Civil No. CCB-06-2055, 2007 U.S. Dist. LEXIS 81570 at *14-15 (D. Md. Oct. 26, 2007), those Courts held that a right of privacy protected by

certain provisions of the Fair Credit Reporting Act ("FCRA") and the Telephone Consumer Protection Act ("TCPA"), respectively, were violated when information was distributed to the owner of the information alone. Initially, neither of these cases is particularly persuasive to this Court, insofar as this Court is required to look at the language of the policies vis-à-vis Pennsylvania law. Moreover, in *Zurich*, the policy language at issue provided coverage for personal injury "arising out of … oral or written publication, *in any manner*, that violates a person's right of privacy." *Zurich*, 2007 U.S. Dist. LEXIS 81570 at * 3 (emphasis added). Furthermore, and most significantly, the Court in *Zurich* held that the FCRA establishes a right of privacy in an individual's credit records. *Id*. at *9. The Court held that, in accessing the plaintiffs' credit records for purposes of solicitation, the defendant in the underlying litigation potentially violated the plaintiffs' right of privacy, triggering the above mentioned policy language. *Id*. at * 16-17. While the Court there held that "publication" did not require dissemination to a third party, the Court specifically read "publication" in the context of the entire personal injury provision in determining the potential applicability to the underlying FCRA claim. In order for the claim to fall within coverage, the Court held, Fieldstone had to have alleged a violation of the plaintiffs' right of privacy in the credit information and unauthorized access to said information, in violation of the plaintiffs' privacy interests. The Court held that it was *both* the unauthorized access of the plaintiffs' credit information and the publication of the information by mailed solicitation that triggered coverage. *Id*.

Likewise, in *Park University Enterprises*, the Court looked at policy language which provided coverage for publication of material "that violates a person's right of privacy." *Park University*, 442 F.3d at 1247. The Court ultimately held that a violation of TCPA

violated an individual's "right to privacy" because it infringed on an individual's right to seclusion. *Id.* at 1250. The Court found that, in the context of the policy at issue, and under Kansas law, a violation of TCPA fell within the policy language's meaning of "publication" because the defendant communicated the information generally, "which undermined the recipients' rights to be left alone. *Id.* (holding, "[b]y faxing advertisements to the class of plaintiffs as alleged in the underlying state court complaint, Park University effectively published material in this broader sense … The transmission of an allegedly unsolicited fax can constitute a publishing act, while receiving the same can result in an invasion of privacy."); *See also Western Rim Advisors, Inc. v. Gulf Insurance Co.*, 269 F. Supp. 2d 836 (holding TCPA violation triggered "material that violates a person's right to privacy").

The underlying litigation in this case, however, alleges no violation of a privacy right, and no general communication of private information, nor does the Complaint allege that the FACTA truncation provisions protect a privacy right. Rather, the Complaint alleges that the truncation provision was enacted to *prevent potential* identity theft, and that, in failing to truncate properly, Whole Enchilada failed to protect the class members from *potential* identity theft. (Docket No.12, Exh. B at ¶¶ 36, 74). Furthermore, in *Melrose Hotel*, the District Court for the Eastern District of Pennsylvania, interpreting Pennsylvania law, held that the purpose of the TCPA was to take "aim at the intrusive nature of unsolicited faxes. … But neither the telemarketer's call nor the unsolicited fax implicate the disclosure of personal information." *Melrose Hotel Co. v. St. Paul Fire and Marine Insurance Co.*, 432 F.Supp. 2d 488, 501 (E.D. Pa. 2006). The Court in *Melrose* also held that the TCPA seeks to protect "privacy interest in seclusion, not secrecy." *Id.*

Likewise, in this case, even if the language of the subject policies were similar, there is no indication that the passing back of a receipt to a cardholder implicates disclosure of personal information, insofar as the aim of this provision of FACTA is to prevent *potential* identity theft, not to protect an individual's privacy right in seclusion.

The Court predicts that, given the meaning of "publicity" in the context of Pennsylvania law and the language of the policy, coverage pursuant to "publication of material … that gives unreasonable publicity to a person's private life" is not triggered by an alleged FACTA violation. Moreover, Whole Enchilada, as a commercial insured, could not reasonably expect that the language providing coverage for "material that … gives unreasonable publicity to a person's private life" would provide coverage for an allegation that Whole Enchilada gave cardholders receipts without truncating credit or debit card numbers. More specifically, the plain language "material that … gives unreasonable *publicity* to a person's private life" clearly requires an allegation that an individual's private information was somehow made known to the public. Here, there is no allegation that such disclosure was made in the underlying Complaint. (Docket No. 12, Exh. B).

D.      "Damages"

In regard to Travelers' argument that the Reed litigation fails to allege "damages" as covered under the policies, the Court finds that the damages alleged in the *Reed* Complaint, as a result of the alleged FACTA violation, are not covered under the policy. In making this determination the Court reads the allegations of the Complaint against the policy language. *Mutual Benefits Insurance Co. v. Haver*, 725 A.2d 743, 745 (Pa. 1999).

The Court turns now to Travelers' argument and analyzes same. Travelers specifically argues that "[T]he statute provides for statutory damages of $100 to $1000 for willful violation, but not on the basis of any actual alleged injury .. coverage in such a situation would contradict Pennsylvania law." (Docket No. 26 at 26). Travelers also argues that, in the absence of any alleged *actual* damage, there is no coverage under the plain language of the policy. *Id*.

First, the Court looks to the damages allegations contained in the Complaint. The *Reed* Complaint seeks, *inter alia*, the following relief:

> a. An award to Plaintiff and the members of the class of statutory damages pursuant to 15 U.S.C. § 1681n(a)(1)(A) for [Whole Enchilada's] willful violations (up to but not exceeding the fullest extent allowed under the Constitution of the United States);

> b. An award to Plaintiff and the members of the class of punitive damages pursuant to 15 U.S.C. § 1681n(a)(2) (up to but not exceeding the fullest extent allowed under the Constitution of the United States); …

(Docket No. 12, Exh. B at 19).

Secondly, the Court looks to the pertinent policy language. The WEB XTEND endorsement provides coverage for "damages" as follows:

**SECTION I- COVERAGES …**

**COVERAGE B PERSONAL INJURY, AD-VERTISING INJURY AND WEB SITE INNURY LIABILITY**

    **1.**    **Insuring Agreement**

        **a.**  We will pay those sums that the insured be-comes legally obligated to pay as damages because of "personal injury" "advertising in-

jury" or "web site injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit"[12] seekng those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal injury" or "advertising injury," or "web site injury" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" or offense and settle any claim or "suit" that may result. But …

**(1)** The amount we will pay for damages is limited as described in Section III- Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverage A or B or medical expenses under Coverage C.

---

[12]     "Suit" is defined in the policy as follows:

**SUIT**

The definition of **"Suit" (SECTION V-DEFINITIONS)** is deleted in its entirety and replaced by the following:

"Suit" means civil proceeding in which damages because of "bodily injury", "property damage", "personal injury", "advertising injury" or "web site injury" to which this insurance applies are alleged. "Suit" includes:

**a.**     An arbitration proceeding in which such damages are claimed and to which you must submit or do submit with our consent; or

**b.**     Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent.

> No other obligation or liability to pay sums or
> perform acts or services is covered unless explic-
> itly provided for under Supplementary Payments
> - Coverages A and B.
>
> **b.** This insurance applies to:
>
> > **(1)** "Personal injury" caused by an offense
> > arising out of your business, excluding
> > advertising, publishing, broadcasting or
> > telecasting done by or for you; …

The term "damages" is not defined in the policy. Therefore, the Court turns to Pennsylvania case law, as well as the plain meaning of the term. *Castegnaro*, 772 A.2d at 459; *see also* NORTON ON INSURANCE COVERAGE 2d Ed. § 3(c)1. Furthermore, the Court must read the language of the policy against the underlying complaint. *Mutual Benefits Ins. Co.*, 725 F.3d at 725.

The Complaint explicitly alleges that Whole Enchilada had knowledge of the FACTA truncation provisions through extensive distribution of information related to the enactment of the statute. (Docket No. 12, Exh. B at ¶¶ 19-31, 34-35). The Complaint avers that:

> … [Whole Enchilada] had actual knowledge of FACTA's truncation
> requirements, specifically including the requirement that credit and debit
> card expiration dates be truncated on receipts presented to consumers at
> the point of sale … Despite knowing and being repeatedly informed about
> FACTA and the importance of truncating credit card and debit card
> numbers and preventing the printing of expiration dates on receipts, and
> despite having had up to more than three years to comply with FACTA's
> requirements, [Whole Enchilada] willfully violated and continues to
> violate FACTA's requirements by, inter alia, printing more than five digits
> of the card number and/ or the expiration date upon the receipts provided
> to members of the class- persons with whom [Whole Enchilada] transacts
> business.

(Docket No. 12, Exh. B at ¶¶ 33, 71). The statutory and punitive damages sought in the *Reed* Complaint are based on its allegations of Whole Enchilada's willful violation or wrongdoing.

1.      Statutory Damages

For purposes of interpreting an insurance policy, " '[d]amages,' as a legal term, generally has been interpreted to refer to awards of compensation." NORTON ON INSURANCE COVERAGE at § 15.D(2) (citing *e.g. United States v. Price*, 688 F.2d 204, 212 (3d Cir. 1982). "The Third Circuit, in cases involving private contracts and insurance policies, has recognized that 'damages' is a technical term that must be afforded its recognized legal meaning."  Id. (citing *Miller v. Weller*, 288 F.2d 438 (3d Cir. 1961); *Federal Insurance Co. v. Susquehanna Broadcasting Co.*, 727 F.Supp. 169, 173 (M.D. Pa. 1989), *amended in part on reconsideration*, 738 F.Supp. 896 (M.D. Pa. 1990), *aff'd without op.*, 928 F.2d 1131 (3d Cir.), *cert denied*, 502 U.S. 823 (1991)).   The legal meaning of 'damages' is "compensation for a legal injury sustained." *Miller*, 288 F.2d at 440, n. 4 (citations omitted); *see also* BLACKS LAW DICTIONARY, 8th Ed. at 416 (defining "damages" as money claimed by, or ordered to be paid to, a person as compensation for loss or injury").

"Statutory" damages are distinguished from the legal meaning of "damages," generally.  BLACKS LAW DICTIONARY 8th Ed. at 419 (defining "statutory damages" as "damages provided by statute … as distinguished from damages provided under the

common law"). Statutory damages are generally awarded in place of actual damages, where no actual injury is alleged. *See e.g. Planned Parenthood of Southeastern Pa, Inc. v. Walton*, No. Civ. A. 95-2813, 1998 WL 88373 at *1 (E.D. Pa. Feb. 12, 1998); *Schnall v. Amboy National Bank*, 279 F.3d 205, 215 n. 5 (3d Cir. 2002); *Korman v. Walking Co.*, 503 F.Supp. 2d 755, 759 (E.D. Pa. 2007) (noting that under FACTA, statutory damages were available because plaintiff alleged no actual injury as a result of defendant's conduct).

In this case, the damages sought in the allegations of the Complaint are not damages for actual sustained injury, but rather, are sought pursuant to the provisions of FACTA, which prescribe statutory damages where no actual damage is alleged. (Docket No. 12, Exh. B at 19); 15 U.S.C. § 1681n(a)(1)(A). However, the plain meaning of the term "damages" is "compensation for a loss or injury sustained by the plaintiff." *Miller*, 288 F.2d at 440, n. 4. Therefore, in order for coverage to be found, the underlying Complaint must allege that the damages sought are compensation for injury. *See Melrose Hotel Co.*, 432 F.Supp. 2d at 509 (holding that damages alleged under TCPA fell within the meaning of "property damage" because there was actual property damage to the plaintiffs in the form of lost toner, paper, and use of fax machine). Here, as discussed above, the Complaint alleged only *potential* harm, therefore, no damage is alleged that would subject Travelers to coverage under the terms of its policies.

Moreover, under Pennsylvania law, damages arising from conduct in which a defendant intentionally violates the rights of the plaintiff are not covered under a commercial generally liability policy, as a matter of public policy. *See Aetna Casualty & Surety Co. v. Roe*, 650 A.2d 94, 100 (Pa.Super. 1994) (citing *Creed v. Allstate Insurance*

*Co.*, 529 A.2d 10 (1987), *app. denied*, 538 A.2d 499 (1988). The purpose of the statutory damages provision in FACTA is to compensate the plaintiffs for willful non-compliance of the statute when there are no actual damages. National Consumer Law Center, Fair Credit Reporting, 6th Ed. at § 11.11. There is no requirement that Whole Enchilada's conduct caused injury. Rather, in order to be liable for statutory damages, a FACTA defendant need only have committed a violation of the truncation provision of the Act. *Id.* at 11.10.2.4, 11.11. Further, statutory damages are available only for willful violations of FACTA, not for mere negligence. *Id.* The purpose of statutory damages is to require a FACTA defendant to pay for willful violations of the truncation provision, not to compensate the claimants for any actual monetary or physical loss. Said damages are akin to punitive in nature. As such, in this Court's estimation, it would be contrary to Pennsylvania public policy to permit Whole Enchilada coverage for statutory damages. *Aetna Cas. & Sur. Co.*, 650 A.2d at 100.

    2.       Punitive Damages

Likewise, it is generally against public policy in Pennsylvania to provide coverage for punitive damages. *See Aetna Cas. & Sur. Co.*, 650 A.2d at 100 (Pa. Super. 1994). *See also Pennbank v. St. Paul Fire and Marine Insurance Co.*, 669 F.Supp. 122, 125 (W.D. Pa. 1987) (holding, "[p]ublic policy does not permit a tortfeasor who is personally guilty of wanton misconduct to shift the burden of punitive damages to his insurer") (internal quotations omitted). Therefore, there is no coverage for the punitive damages sought in the Complaint.

The *Reed* Complaint alleges more than "wanton misconduct;" it alleges a willful violation of a statute. (Docket No. 12, Exh. B at ¶¶ 33, 71) ("[Whole Enchilada] willfully violated and continues to violate FACTA's requirements. … [Whole Enchilada] willfully violated FACTA in *conscious disregard of the rights of [Reed]*") (emphasis added).  It does not, however, seek any actual damages.  (Docket No. 12, Exh. B at 19).  Accordingly, the Court predicts that under Pennsylvania law, public policy does not permit Whole Enchilada to shift its burden of paying for its willful non-compliance to Travelers, in regard to either the statutory or punitive damages alleged by the Complaint.  *Esmond v. Liscio*, 224 A.2d 793 (Pa. Super. 1966); *see also Carey v Employers Mutual Casualty Co.*, 189 F.3d 414, 418 (3d Cir. 1999) (holding that, for purposes of a policy's exclusionary language, the court may look to the nature of the "sanction" in determining whether the policy excludes coverage for alleged damages).[13]

---

[13]    Furthermore, while neither party addresses this argument, this policy contains an exclusion for "Knowing Violation of Rights of Another":

**2.    Exclusions.**

This insurance does not apply to:

**a.    Knowing Violation Of Rights Of Another**

> "Personal injury," "advertising injury" or "web site injury" caused by or at the diretion of the insured with the knowledge that the act would violate the rights of another and would inflict "personal injury," "advertising injury" or "web site injury". …

(Docket No. 12, Exh. C at 1 of 4).

3. Damages in the Context of Personal Injury under the Policy Language

There is no coverage for the alleged damages in *Reed*, when the term "damages" is read in the context of the entire policy provisions providing coverage for "personal injury." The language of the policy provides that Travelers "will pay for those sums that the insured becomes legally obligated to pay as damages because of 'personal injury' … *to which this insurance applies*." (Docket No. 12, Exh. C at 25-27; Exh. D at 26-28) (emphasis added). []The policy provides, "[w]e will pay for those sums that the insured becomes legally obligated to pay as damages because of 'personal injury' …" (Docket No. 12, Exh. C at 25-27; Exh. D at 25-28). Reading the term "damages" in the context of the entire policy, even if the Court were to have found "damages" to potentially include the claimed statutory and punitive damages, it is not enough that the underlying complaint allege "damages." Rather, the Complaint must allege "damages … because of 'personal and advertising injury' *to which this insurance applies*. 'Personal and advertising injury' means injury arising out of … oral or written publication of material that appropriates a person's likeness …  or gives unreasonable publicity to a person's private life." (Docket No. 12, Exh. At 25-27; Exh. D at 25-28) (emphasis added). As discussed above, the allegations in the *Reed* Complaint do not fit the description of injury "arising out of oral or written publication of material that appropriates a person's likeness … or gives unreasonable publicity to a person's private life."

---

In the Court's opinion, this exclusion could be potentially applicable to further support denial of this claim, insofar as the Complaint alleges that Whole Enchilada knowingly violated the rights of the plaintiffs in violating FACTA.

As such, the Court finds that the claim for statutory and punitive damages arising out of the alleged FACTA violation are not the type of "damages" covered under the terms of the subject policies.

### VI.  Travelers' Alleged Duty to Indemnify

As to Travelers' duty to indemnify, the WEB XTEND Endorsement states:

a.   We will pay for those sums that the insured bec-
comes legally obligated to pay as damages
because of "personal injury" …

… arising out of one or more of the following
offenses:

e.   Oral, written or electronic publication of material
that appropriates a person's likeness, unreasona-
bly places a person in a false light or gives unrea-
sonable publicity to a person's private life.

(Docket No. 12, Exh. C. at 25-27; Exh. D at 25-28).

As noted above, an insurer's duty to defend is broader than its duty to indemnify. *J.H. France Refractories Co. v. Allstate Insurance Co.*, 626 A.2d 502 (Pa. 1993), yet, the insurer's duty to indemnify is distinct from its duty to defend. *Key Handling Systems, Inc.*, 729 A.2d at 116.  In order for Travelers to have a duty to indemnify, it must be established that the damages alleged in the underlying complaint are actually covered under the terms of the policy.  *U.S.X. Corp.*, 99 F.Supp.2d at 612.  However, in *Kvaerner Metal Division of Kvaerner U.S., Inc. v. Commercial Union Insurance Co.*, 908 A.2d 888, 900 (Pa. 2006), the Supreme Court of Pennsylvania held that, where the Court held there is no duty to defend under Pennsylvania law, because the duty to indemnify is narrower than the duty to defend, there will likewise be no duty to indemnify.  Because in

this case the Court has held there is no duty to defend, there is likewise no duty to indemnify under the terms of the insurance policies.

## CONCLUSION

For the foregoing reasons, the Court grants Travelers' Motion for Summary Judgment and denies Whole Enchilada's Partial Motion for Summary Judgment. An appropriate Order follows.

_s/ Nora Barry Fischer_
Nora Barry Fischer
United States District Judge

Dated: September 29, 2008

cc: All counsel of record.